1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SERGIO ALVAREZ,                                    )        No. C 04-1198 SBA (pr)
                                                   )
                Plaintiff,                         )        **ORDER GRANTING**
                                                   )        **DEFENDANTS' MOTION FOR**
v.                                                 )        **SUMMARY JUDGMENT AND**
                                                   )        **ADDRESSING PENDING**
DWIGHT WINSLOW, et al.,                            )        **MOTIONS**
                                                   )
                Defendants.                        )        (Docket Nos. 24, 27, 36)
_____            )

## INTRODUCTION

Plaintiff Sergio Alvarez (hereinafter "Plaintiff"), a state prisoner incarcerated at Pelican Bay State

Prison (hereinafter "PBSP") in Crescent City, California, filed this *pro se* civil rights action pursuant to

42 U.S.C. § 1983 for deliberate indifference to Plaintiff's serious medical needs.  Venue is proper

because Plaintiff challenges acts that occurred at PBSP, which is located in this judicial district.  *See* 28

U.S.C. § 1391(b).

Plaintiff alleges in part that Defendants were deliberately indifferent to his serious medical needs

related to the diagnosis and treatment of his gastrointestinal problems, which stemmed from the removal

of his gall bladder.  Specifically, Plaintiff alleges that he was not provided a diet that properly met his

need for low fat foods, and thus he was forced to suffer unnecessarily from stomach pain caused by his

fat-intolerance.  Plaintiff seeks declaratory relief, nominal damages, and punitive damages.

In its Order of Service, the Court found Plaintiff's complaint had stated a cognizable Eighth

Amendment claim as to Health Care Manager Dr. Dwight W. Winslow, Staff Physician Dr. D. M.

Hechanova, and Correctional Health Services Administrator II Acel K. Thacker (hereinafter

"Defendants") for deliberate indifference to Plaintiff's serious medical needs.[1]  The Court dismissed all

_____

[1]  In the Court's initial screening of the complaint, it liberally construed the claims and found that

Plaintiff's complaint had also stated a cognizable claim against Dr. Linda Rowe.  The Court notes that to

date, Dr. Rowe has not been served in this action.  The Court has conducted a closer review of Plaintiff's

complaint and has reconsidered its initial determination.  Even upon liberally construing Plaintiff's complaint,

the Court now finds that he fails to state a valid cognizable deliberate indifference claim against Dr. Rowe.

Plaintiff names Dr. Rowe as a defendant in this action and alleges that she failed to give him adequate

1    other named Defendants from this action.

2         Before the Court is Defendants' motion for summary judgment on the grounds that the

3    undisputed facts show that they did not violate Plaintiff's rights under the Eighth Amendment and that

4    they are entitled to qualified immunity (docket no. 27). Plaintiff has filed an opposition to Defendants'

5    motion for summary judgment (hereinafter "Opposition") (docket no. 38). Plaintiff has also filed two

6    motions to compel discovery (docket nos. 24, 36).

7                                        **BACKGROUND**

8         The following statement of facts is based on declarations and documentary evidence submitted

9    by the parties. The facts are undisputed, unless otherwise noted.[2]

10        On February 6, 2001, Plaintiff underwent a "cholestictectomy," the removal of his gall bladder.

11   As a result of this operation, his body could no longer store bile, which plays a role in the digestion of

12   fats. Therefore, he was advised to avoid fatty foods. Following surgery, however, Plaintiff continued to

13   receive the regular prison diet served to inmates in the PBSP Security Housing Unit (hereinafter

14

15   _____

16   medical care. However, Plaintiff has not alleged facts which, if true, would support a finding of deliberate
     indifference to serious medical needs against Dr. Rowe. Plaintiff alleges that on April 2, 2003, he was
17   interviewed by Dr. Rowe regarding his grievance seeking renewal of his "3000 Cal/Low Fat/Low Salt" diet.
     (*Id.* at 12.) He claims Dr. Rowe insisted the "Heart Healthy" diet was adequate for him and denied the
18   grievance. (*Id.*) He also claims that she "reminded Plaintiff that he was already on a low fat diet [and that
     she] would order further tests." (*Id.*) On April 18, 2003, Plaintiff alleges Dr. Rowe "ordered additional
19   tests: G.I., Glucose and Bilirubin [which he alleges is a fluid produced by the liver]." (*Id.*) While Plaintiff
     alleges Dr. Rowe ordered additional tests, he does not indicate how Dr. Rowe was deliberately indifferent
20   to his medical needs in doing so. His main allegation appears to be that Dr. Rowe failed to give him the
     benefit of an adequate inmate appeals process when she denied his grievance, however, that does not state
21   a claim for violation of Plaintiff's constitutional rights. Dr. Rowe's actions in processing Defendant's
     grievance, without more, is not actionable under § 1983. *See Buckley v. Barlow*, 997 F.2d 494, 495 (8th
22   Cir. 1993) (prison grievance procedure is procedural right that does not give rise to protected liberty
     interest requiring procedural protections of Due Process Clause). As such, Plaintiff has failed to state a
23   cognizable claim against Dr. Rowe. For the foregoing reasons, the Court summarily DISMISSES Dr.
     Rowe from this action. *See* 28 U.S.C. 1915(e)(2)(B)(ii) (The Court "shall dismiss the case at *any* time" if
24   the Court determines that the action "fails to state a claim on which relief may be granted".) (emphasis
     added).
25

26       [2] In support of Defendants' motion for summary judgment, Defendants submitted declarations,
     which the Court will cite to when necessary.
27

28

"SHU").

During a February 20, 2001 medical visit, Plaintiff reported that he had been experiencing severe abdominal pain. Dr. Edward Kazel,[3] a staff physician at PBSP, ordered a special low fat diet called the "3000 Cal/Low Fat/Low Salt" diet for Plaintiff, with a follow-up appointment in ninety days to assess the effect of the diet. (Hechanova Decl. in Supp. of Defs.' Mot. for Summ. J. ["Hechanova Decl."], Ex. C.)

On March 6, 2001, PBSP's Dietician, J. Hartman, stated that Plaintiff was "tolerating the regular diet without problems" and the "3000 Cal/Low Fat/Low Salt" diet was only recommended for ninety days post-surgery. (Hartman Decl. in Supp. of Defs.' Mot. for Summ. J. ["Hartman Decl."] ¶ 5, Ex. B.)

Dr. Kazel's request to put Plaintiff on the "3000 Cal/Low Fat/Low Salt" diet for ninety days was approved on March 14, 2001.[4]

On May 16, 2001, Plaintiff was examined by Dr. Cooper, a staff physician at PBSP, for complaints of nasal stuffiness and stomach burn that was controlled by taking Mylanta. (Hechanova Decl. ¶ 4.)

On May 25, 2001, Plaintiff was again examined by Dr. Cooper for complaints of an upset stomach. (*Id.* ¶ 5.) At that time, it was noted that Plaintiff was not in need of a special diet. (*Id.*) Plaintiff's burning sensation in his stomach was once again controlled by taking Mylanta. (*Id.*)

On June 5, 2001, Plaintiff requested a medical appointment because it was time for his diet to be renewed.

Plaintiff was given a medical appointment on June 8, 2001 with Dr. Jenkins, another staff physician at PBSP. Plaintiff told Dr. Jenkins that his "3000 Cal/Low Fat/Low Salt" diet had alleviated much of his pain, but that the diet been terminated. Dr. Jenkins diagnosed Plaintiff as fat-intolerant and renewed the "3000 Cal/Low Fat/Low Salt" diet. Dr. Winslow approved the diet for one year. While

---

[3]  The Court notes that Plaintiff misspelled Dr. Kazel's name as Dr. "Kagel" in his complaint.

[4]  Changes in an inmate's diet are only authorized by a physician and with the approval of the Health Care Manager (Dr. Winslow) or the Chief Physician and Surgeon.

3

1    Plaintiff received this diet, he did not suffer from severe abdominal pain.

2           On or about June 25, 2002, Plaintiff stopped receiving the "3000 Cal/Low Fat/Low Salt" diet,

3    and he soon began to experience severe abdominal pain, particularly after he ate meat.

4           On July 31, 2002, Plaintiff had a medical appointment with Dr. Hechanova.  Plaintiff alleges that

5    Dr. Hechanova told him he no longer needed a "3000 Cal/Low Fat/Low Salt" diet because "the regular

6    diet given to all SHU prisoners [was] already low in fat."  Plaintiff alleges that Dr. Hechanova

7    prescribed Prilosec for Plaintiff's pain.[5]

8           On August 4, 2002, Plaintiff filed a prison grievance requesting a "3000 Cal/Low Fat/Low Salt"

9    diet.  At the informal level of review, Plaintiff alleges that Dr. Hechanova granted his grievance and

10   renewed his "3000 Cal/Low Fat/Low Salt" diet for six months.

11          During a September 16, 2002 medical visit with Dr. Hechanova, Plaintiff reported feeling better.

12   Dr. Hechanova noted in the medical record that Plaintiff was still complaining of bloating, gaseousness,

13   and indigestion.  The plan was to prescribe the medication Zantac and continue with Plaintiff's diet as

14   well as his current prescription medications, Mylanta and Prilosec.  (Hechanova Decl. ¶ 8.)  When

15   asked by Dr. Hechanova if he was feeling better after receiving his "3000 Cal/Low Fat/Low Salt" diet,

16   Plaintiff replied in the affirmative.  (*Id.*)

17          During October 2002, PBSP initiated the "Heart Healthy" diet that began replacing the "3000

18   Cal/ Low Fat/Low Salt" diet for inmates who could not medically tolerate the regular diet.[6]  (Winslow

19   Decl. in Supp. of Defs.' Mot. for Summ. J. ["Winslow Decl."] ¶ 8.)  The medical staff, including

20   Dietician Hartman, reviewed the findings of the American Diabetic Association and found that the

21   "Heart Healthy" diet was equivalent to the "3000 Cal/ Low Fat/ Low Salt" diet.  *(Id.)*

22          Dietician Hartman noted that the "Heart Healthy" diet was a low fat diet that met the dietary

23   needs of Plaintiff as it contained 2,900 calories, with only 30% or less of the total calories derived from

24

25   ───────────────

26          [5]  Plaintiff alleges that Prilosec had "adverse effects upon Plaintiff's liver due to his [Hepatitis-A]
     condition."  (Compl. at 9.)  However, the Court notes that Defendants' declarations do not address this
27   issue.

28          [6]  The other exceptions to the regular diet are four medical diets, including Dental Sort Diet, Gluten
     Restricted Diet, Hepatic Diet, and Renal Diet.  (Hartman Decl. ¶ 4.)

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

fat.  (Hartman Decl. ¶ 6.)  It was equivalent to the "3000 Cal/Low Fat/Low Salt" diet that contained approximately 28% fat.  (*Id.*)  Plaintiff was counseled regarding the dietary guidelines he should follow in selecting his food items from the "Heart Healthy" diet in order to meet his daily calorie requirements.  (*Id.* ¶¶ 6-7)  Additionally, Dietician Hartman addressed Plaintiff's concerns about his food choices on the "Heart Healthy" diet.  (*Id.* ¶ 7)  As a result of his interview with Dietician Hartman, it was decided that Plaintiff was to be provided an extra sack lunch to further his food choices.  (*Id.*)

On or about February 14, 2003, Plaintiff's "3000 Cal/Low Fat/Low Salt" diet was stopped. He began receiving high-fat items in his meals, such as creamed beef, hot dogs, and hamburgers.  He again experienced severe abdominal pain.

During a February 18, 2003 medical visit with Dr. Hechanova, Plaintiff requested the renewal of his "3000 Cal/Low Fat/Low Salt" diet.  Dr. Hechanova denied the request, however, telling Plaintiff that PBSP's "Heart-Healthy" diet met his medical needs.  On that same date, Plaintiff filed a prison grievance seeking renewal of his "3000 Cal/Low Fat/Low Salt" diet.  On February 19, 2003, Nurse P. Brous denied the grievance, claiming the "Heart Healthy" diet was adequate for Plaintiff.  Nurse Brous noted that Dr. Hechanova had denied Plaintiff's request the prior day.

On February 25, 2003, Plaintiff resubmitted the grievance to the first formal level of review.

On April 2, 2003, Plaintiff was interviewed by Dr. Rowe regarding the grievance.  Dr. Rowe insisted the "Heart Healthy" diet was adequate for him and denied the grievance.  She said she would test him for ulcers, but that even if ulcers were detected, no low-fat/low salt diet would be ordered.  She also said that he might be referred to a gastroenterologist.  Administrator Thacker filed a supplement to Dr. Rowe's first-level decision, which endorsed her findings and her disposition of the grievance.  It was explained to Plaintiff that the new "Heart Healthy" diet was the equivalent of the old "3000 Cal/Low Fat/Low Salt" diet and that therefore he was receiving a low-fat/low salt diet.  (Thacker Decl. in Supp. of Defs.' Mot. for Summ. J. ["Thacker Decl."] ¶ 4.)  Consequently, the inmate appeal was partially granted to further evaluate Plaintiff's medical condition.  (*Id.*)

On or about April 7, 2003, Dr. Rowe ordered a series of blood tests for Plaintiff.  The test results indicated that the glucose level was low, bilirubin was high, and triglycerides were high.  It was

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

explained to Plaintiff that these test results were only borderline low or high and, therefore, close to the normal range.  As a consequence of these blood test results, further blood tests were ordered and an appointment was made with Dr. Soggee, a gastroenterologist in the PBSP Specialty Clinic.  (Winslow Decl. ¶ 9).

On April 21, 2003, Plaintiff resubmitted his grievance to the second formal level of review.  The grievance was "partially granted" by Dr. Winslow and Administrator Thacker on May 1, 2003.  The second-level decision noted that Plaintiff had been scheduled for a medical visit on May 2, 2003, and that Dr. Rowe had conducted blood tests and had referred him to a gastroenterologist.  Plaintiff's request for the "3000 Cal/Low Fat/Low Salt" diet was denied because he did not meet PBSP's criteria for a low-fat/low salt diet, which was reserved for inmates with chronic hypertension.

On or about May 1, 2003, at the request of Dr. Winslow, Administrator Thacker conducted the review of the inmate's medical file.  (Thacker Decl. ¶ 6.)  At that time, Administrator Thacker noted that Dr. Rowe had ordered additional blood tests, that the previous blood tests, while abnormal, were not significant from a disease or illness standpoint.  (*Id.*)  Further, the medical records indicated that Plaintiff was not hypertensive; therefore he did not meet the criteria for a low-fat/low salt diet.  (*Id.*)  Because an appointment was scheduled for the gastroenterologist on May 15, 2003, the inmate appeal was partially granted.  (*Id.*)

On May 8, 2003, Dr. Hechanova examined Plaintiff and reviewed the lab results previously ordered by Dr. Rowe.  Plaintiff had continuing abdominal pain, the etiology of which was unknown.  Dr. Hechanova also noted that a referral had been made for Plaintiff to see a gastroenterologist on May 15, 2003.  (Hechanova Decl. ¶ 12.)

On May 15, 2003, Plaintiff had a medical appointment with the gastroenterologist, Dr. Soggee, who recommended that Plaintiff's low-fat/low salt diet be renewed.  Dr. Soggee advised Plaintiff, in the meantime, to avoid eating any fatty foods on his meal tray.

At a May 27, 2003 medical appointment, Plaintiff alleges that Dr. Hechanova declined to follow

United States District Court
For the Northern District of California

1

Dr. Soggee's recommendation, and did not put him on a low fat/low salt diet.[7]

2

On June 2, 2003, Plaintiff submitted his prison grievance for third formal level review.

3

On July 24, 2003, Plaintiff was once again seen by Dr. Soggee, who diagnosed Plaintiff as

4

fatty-foods intolerant and again recommended to renew the "3000 Cal/Low Fat/Low Salt" diet.

5

On July 31, 2003, Dr. Arenas followed Dr. Soggee's recommendations and issued a six-month

6

chrono[8] for a low fat/low salt diet.

7

During a September 3, 2003 appointment with Dr. Arenas, Plaintiff reported that he still had not

8

received the low fat/low salt diet, and Dr. Arenas said he would check the status of his chrono.

9

On September 3, 2003, Plaintiff's grievance was denied at the third formal level of review by

10

Capt. P. Enriquez and Chief of Inmate Appeals Nancy Grannis.  The decision summarizes Plaintiff's

11

medical treatment from May through September 2003 and states that Dr. Soggee issued a chrono for a

12

low fat/low salt diet for one year, beginning September 2, 2003.

13

During a September 18, 2003 appointment with Dr. Soggee, Plaintiff reported that he still had

14

not received his chrono for the low fat/low salt diet and that he had lost five to eight pounds because he

15

16

17

[7]  On May 27, 2003, Dr. Hechanova examined Plaintiff and noted a history of elevated lipids from

18

his lab results.  The plan was to continue the present medications until a fasting lipid panel blood test was

19

completed.  Further, it was noted that Plaintiff had not been on any hypertension medication for the past six

20

to twelve months.  Dr. Hechanova's physician progress notes dated May 27, 2003 stated that Dr. Soggee

21

recommended a low-fat/low salt diet.  Dr. Soggee also ordered an abdominal and pelvic CT scan, chest x-ray, and a follow-up appointment in two months.  The results of the exams were negative.  Additional blood

tests performed on July 8, 2003 were normal.  (Hechanova Decl. ¶ 13.)  While Dr. Hechanova was aware

22

of the medical issue of Plaintiff's intolerance to fatty foods, it was his opinion that when Plaintiff met the

23

criteria for the "3000 Cal Low Fat/Low Salt" diet, Dr. Hechanova recommended it and requested

24

approval.  (*Id.* ¶ 16.)  However, the regular diet at PBSP was changed in October 2002 to the "Heart

25

Healthy" diet that Dr. Hechanova understood to be the nutritional and low fat equivalent of the "3000

Cal/Low Fat/Low Salt" diet.  (*Id.*)  The "3000 Cal/Low Fat/Low Salt" diet was no longer available.  (*Id.*)

26

Additionally, Plaintiff's symptoms were consistently present, including bloating, gaseousness, and

indigestion, regardless of what diet he was on.  (*Id.*)  However, these conditions were being controlled by

27

medications.  (*Id.*)  It was Dr. Hechanova's opinion that Plaintiff received the appropriate medical care at all

times.  (*Id.*)

28

[8]  A "chrono" is a form that allows prisoners to request certain medical accommodations as deemed

necessary by medical staff.

United States District Court
For the Northern District of California

1

2   was selectively eating from the regular meal trays.[9]  Dr. Soggee said he would personally look into the matter.

3

4   On September 26, 2003, Plaintiff was informed that Dr. Winslow had disapproved Dr. Arenas's order for a low fat/low salt diet.

5

6   On October 14, 2003, Plaintiff reviewed his medical file.  There was no paperwork in the file disapproving his requests for a low fat/low salt diet.

7

8   During an October 28, 2003 appointment with Dr. Arenas, Plaintiff reported that he had lost about 15 pounds because he was not receiving a proper diet.  Dr. Arenas said she would recommend the low fat/low salt diet again, but it appears that her recommendation was overruled by her superiors. Petitioner apparently never received his chrono for a low fat/low salt diet.

9

10

11

12   On July 12, 2004, Dr. Hechanova examined Plaintiff.  By that time, Plaintiff had been diagnosed by Dr. Soggee as having a mild liver condition of Gilbert's disease because of the elevated bilirubin (etiology unknown), and the condition of intolerance to fatty foods.  (Hechanova Decl. ¶ 14.)

13

14

15   **LEGAL STANDARD**

16   Summary judgment is proper where it is established that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Summary judgment is warranted against a party which "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id*.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, all inferences to be drawn from the facts must be viewed in a light most favorable to the non-moving party.  *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

17

18

19

20

21

22

23

24

25

26

27

28   [9]  According to his Declaration, Dietician Hartman reviewed Plaintiff's medical records to determine if there had been any significant weight loss.  The medical records reflect that Plaintiff has reasonably maintained his weight within the recommended standard.  (Hartman Decl. ¶ 8.)

It is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *See id.*; *see, e.g., Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1028-29 (9th Cir. 2001) (even if there is evidence in the court file which creates a genuine issue of material fact, a district court may grant summary judgment if the opposing papers do not include or conveniently refer to that evidence). Although the district court has discretion to consider materials in the court file not referenced in the opposing papers, it need not do so. *Id.* at 1029. "The district court need not examine the entire file for evidence establishing a genuine issue of fact." *Id.* at 1031.

Although the same standards for summary judgment apply when a *pro se* litigant is involved, the *pro se* litigant "should be given special latitude in responding to a summary judgment motion." *Evans v. Kinard*, 1997 U.S. Dist. LEXIS 15507, at 2 (S.D.N.Y. Oct. 6, 1997) (citing *Gonzalez v. Long*, 889 F. Supp. 639, 642 (E.D.N.Y. 1995)) (internal quotation marks omitted); *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) (noting that "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment"). A request for continuance of discovery at the Summary Judgment stage is governed by Federal Rule of Civil Procedure 56(f). Rule 56(f) provides a mechanism whereby a party opposing a motion for summary judgment may state valid reasons why he is temporarily unable to present "facts essential to justify the party's opposition" to such motion. Fed. R. Civ. P. 56(f); *Weinberg*, 241 F.3d at 750. To comply with this requirement, Plaintiff must "show how additional discovery would preclude summary judgment and why [it] cannot immediately provide 'specific facts' demonstrating a genuine issue of material fact." *In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970, 989 (9th Cir. 1999); *Mackey v. Pioneer Nat'l Bank*, 867 F.2d 520, 523 (9th Cir. 1989). Therefore, whether Plaintiff's request for further discovery was given due process is contingent upon whether Plaintiff's request satisfies the requirements of Rule 56(f).

## ANALYSIS

**I.    Rule 56(f)**

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In addition to filing an Opposition to Defendants' motion for summary judgment, Plaintiff has also filed two motions to compel production of documents. The Court will construe Plaintiff's discovery motions as a request under Federal Rule of Civil Procedure 56(f) ("Rule 56(f)").[10] *See Garrett v. San Francisco*, 818 F.2d 1515, 1518 (9th Cir. 1987) (discovery motion was sufficient to raise issue of whether plaintiff was entitled to relief under Fed. R. Civ. P. 56(f)); *Hancock v. Montgomery Ward Long Term Disability Trust*, 787 F.2d 1302, 1306 n.1 (9th Cir. 1986) (pending motion to compel discovery was sufficient to raise Rule 56(f) consideration); *Bailey v. City of New York*, 2003 U.S. Dist. LEXIS 7254, 32-33 (S.D.N.Y. May 2, 2003) (court construed request for additional discovery from a *pro se* plaintiff in response to a motion for summary judgment as an application pursuant to Fed. R. Civ. P. 56(f)).

Federal Rule of Civil Procedure 56(f) provides a device for litigants to avoid summary judgment when the non-movant needs to discover affirmative evidence necessary to oppose the motion. *See Garrett*, 818 F.2d at 1518. Rule 56(f) provides that a court may deny a summary judgment motion to permit discovery if it appears that a party cannot present facts essential to opposing the motion. Fed. R. Civ. P. 56(f). When a party moves for summary judgment before the opposing party has had a "realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule 56(f) motion fairly freely." *Burlington Northern & Santa Fe Ry. Co. v. The Assiniboine*, 323 F.3d 767, 774 (9th Cir. 2003). Denial of an application under Rule 56(f) is especially inappropriate "where the material sought is also the subject of outstanding discovery requests." *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986). Rule 56(f) requires an affidavit which sets forth the information sought and how it would preclude summary

---

[10]   Rule 56(f), entitled "When Affidavits are Unavailable," states:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f).

United States District Court

For the Northern District of California

judgment by creating a genuine issue of material fact.  *See Hall v. Hawaii*, 791 F.2d 759, 761 (9th Cir. 1986).

By filing his discovery motions, Plaintiff meets Rule 56(f)'s procedural requirement that he submit an "affidavit" setting forth the discovery requested.  Although Plaintiff's discovery motions were not entitled "Affidavit in Support of Rule 56(f) Request," the Ninth Circuit has stated that a court is free to construe a discovery motion as a request under and in compliance with Rule 56(f).  *See Garrett*, 818 F.2d at 1518; *Hancock*, 787 F.2d at 1306 n.1.

Plaintiff's motions were based on his own personal knowledge and signed under penalty of perjury.  (Pl.'s Aff. in Supp. of Notice and Mot. to Compel Disc. at 2.)  He states in his discovery motions that Defendants have failed to provide the following specific documents, despite his discovery requests:

(1)    All documents, rules, and/or reports concerning the adjudication/disposition of inmate appeals, complaints or grievances    regarding lack of adequate medical treatment;

(2)    All documents, reports, or rules regarding complaints by inmates in the SHU at PBSP concerning lack of medical treatment including but not limited to inmate complaints such as inmate appeal forms;

(3)    All documents concerning the medical diagnosis, treatment, and/or triage by PBSP medical staff and Defendants regarding inmates with special medical needs, special diets, or special low fat/low salt medical diets;

(4)    All documents, reports, or rules concerning any discipline and/or reprimands issued to any member of the medical staff at PBSP, including Defendants in connection with medical treatment provided to Plaintiff between 2/6/01 to 11/04;

(5)    All documents, reports, or rules concerning internal communications of PBSP concerning medical treatment provided to Plaintiff from 2/6/01 to 11/04;

(6)    All documents, reports, or rules concerning internal communications at PBSP regarding Plaintiff after 2/6/01;

(7)    All documents, reports, or rules concerning medical treatment provided to Plaintiff from 2/6/01 to 11/04;

(8)    All documents, reports, or rules concerning Plaintiff's requests for medical treatment from 2/6/01 to 11/04;

(9)    All documents, reports, or rules indicating the knowledge of Defendants of any of Plaintiff's needs for medical treatment from 2/6/01 to 11/04;

(10)    All documents, reports, or rules concerning Defendants' responses to

11

Plaintiff's needs for medical treatment or special medical care diets from 2/6/01 to 11/04;

(11)     All documents, reports, or rules concerning medical training received by Defendants;

(12)     All documents, reports, or rules concerning the role of Defendants and/or the role of any one in the same position at PBSP in the provision of medical treatment to inmates;

(13)     All documents, reports and/or rules that relate to medical diets, special medical diets, chronic care, inmate patient care, and chronic clinics;

(14)     All documents, reports, or rules concerning the "Heart Healthy" diet;

(15)     All documents, reports, or rules including but not limited to the medical diet manual; California Department of Corrections' Operation Manual on  medical care concerning: special needs diets, chronic care, chronic clinics, medical staff duties, as well as PBSP Operational Procedures for Medical/SHU concerning special diets and "Heart Healthy" diets;

(16)     All documents, reports, or rules concerning PBSP policies and procedures prepared and distributed by the Health Care Compliance Unit consisting of thirteen volumes;

(17)     All documents, reports and/or rules concerning the Madrid[11] medical suit including the special masters' report(s) and subsequent court orders/mandates as they pertain to Defendants in Plaintiff's case and/or the PBSP medical department.

(*Id.*, Ex. AA [Pl.'s Req. for Produc. of Docs.] at 2-5.)

Rule 56(f) allows a district court to grant a continuance when a party opposing summary judgment wishes to conduct further discovery.  Ordinarily, summary judgment should not be granted when there are relevant facts remaining to be discovered.  However, the party seeking discovery bears the burden of showing what specific facts it hopes to discover that will raise an issue of material fact. *Harris v. Duty Free Shoppers Ltd. Partnership*, 940 F.2d 1272, 1276 (9th Cir. 1991) (citing *Continental Maritime v. Pacific Coast Metal Trades*, 817 F.2d 1391, 1395 (9th Cir. 1987)).  The party seeking continuance may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts, and the mere hope that further evidence may develop prior to trial is an insufficient basis for a continuance under Rule 56(f).  *Continental Maritime*, 817 F.2d at 1395 (citing *Neely v. St. Paul Fire & Maine Ins. Co.*, 584 F.2d 341, 344 (9th Cir. 1978)).

As the Ninth Circuit stated in *Continental Maritime*, under Rule 56(f) "the party seeking a

---

[11]  *Madrid v. Gomez*, No. C 90-3094 THE (N.D. Cal. filed Oct. 26, 1990).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

continuance bears the burden to show what specific facts it hopes to discover that will raise an issue of material fact." *Id.* In the instant case, Plaintiff has not met this burden. By listing requested documents and information without explaining what specific, material facts these documents will likely produce, Plaintiff is simply making vague assertions that additional discovery will produce necessary but unspecified facts. Plaintiff has not shown in any of his filings what specific facts he hopes to discover that will raise an issue of material fact. Rather, Plaintiff has simply put forward a list of desired documents. Thus, Plaintiff has not met his burden under Rule 56(f).[12]

Turning to his Opposition, Plaintiff asserts in conclusory fashion that Defendants are not entitled to summary judgment because there are still genuine issues of material fact, and again simply recites the facts that he set forward in his complaint. (Pl.'s Opp'n. at 1-5). In fact, Plaintiff's argument in his Opposition is limited to a verbatim recital of the conclusory statement of facts found in his original complaint. (*Compare* Pl.'s Opp'n at 1-5 *with* Compl. at 1-19). Because Plaintiff has not shown that relevant facts remain to be discovered, the Court's failure to grant a continuance of discovery is appropriate under the standards contained in Rule 56(f) and is not a violation of Plaintiff's due process rights.

Plaintiff has merely relied on vague assertions in seeking his request for further discovery and has failed to demonstrate that the aforementioned discovery requests would preclude summary

---

[12] Plaintiff also alleges that he did not "receive access to requested documents and because PBSP-SHU does not provide translating staff or assistance for Plaintiff this has continuously and repeatedly resulted in miscommunication between Plaintiff and Law Library Staff." (Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. to Compel at 3.) Plaintiff asserts that the Law Library staff addressed his requests "with wrong and/or incomplete legal materials and Law Library services." *Id.* PBSP Technical Assistant H. Griffin stated that all of the materials requested by Plaintiff are available to Plaintiff through the Law Library and its resources. (Griffin Decl. in Supp. of Defs.' Opp'n to Pl.'s Mot. to Compel ["Griffin Decl."] ¶¶ 3-6). The Law Library staff has personally assisted Plaintiff with the documents requested. (*Id.* at ¶ 3.) Moreover, during February 2005, Plaintiff was permitted additional time in the Law Library because of his pending court cases. (*Id.* at ¶ 7.) Plaintiff's attempts to obtain information were unsuccessful not because of inadequate materials or services, but due to Plaintiff's inability to express his needs in English. (Griffin Decl. ¶¶ 3-6.) The fact that Plaintiff is incapable of expressing his needs to the Law Library Staff due to a language barrier is not the same issue as any discovery abuse on the part of Defendants that would cut in favor of Plaintiff's request under Rule 56(f).

judgment, therefore, the Court DENIES Plaintiff's request for a continuance pursuant to Rule 56(f).[13]

The Court will now address the merits of Defendants' motion for summary judgment.

## II.   <u>Deliberate Indifference to Serious Medical Needs</u>

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs by not providing Plaintiff with a necessary "3000 Cal/Low Fat/Low Salt" diet.  Plaintiff claims he requires this "3000 Cal/Low Fat/Low Salt" diet due to ongoing gastrointestinal problems stemming from the removal of his gallbladder.  Plaintiff alleges that without this diet he is gaseous, bloated, and in very much pain. Plaintiff has stated that with the "3000 Cal/Low Fat/Low Salt" diet he feels "much better."  Plaintiff further alleges that despite his complaints, and despite the medical staff's knowledge of his medical problems, Defendants refused to prescribe him the "3000 Cal/Low Fat/Low Salt" diet.  Therefore, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs because they were responsible for denying him the "3000 Cal/Low Fat/Low Salt" diet, which alleviates his suffering.

Defendants contend that they were aware of the existence of Plaintiff's medical needs and administered to them when they were present.  Defendants assert that they prescribed the "3000 Cal/Low Fat/Low Salt" diet for Defendants for a period of time longer than the ninety-day post surgery, that there is actually "no special diet for post cholecystectomy patients,"[14] and that they also prescribed proper medication to Plaintiff for his upset stomach.  Also, in addition to medications to control his symptoms, Plaintiff has been given an additional sack lunch per day to supplement his calorie intake. Defendants point to the fact that Plaintiff has been examined thoroughly by numerous physicians (including a private specialist) and no discernible serious medical condition other than his fat intolerance and a related mild liver condition has been found.  Defendants assert that the meals supplied to all prisoners are based on the "Heart Healthy" diet that is the equivalent of the "3000 Cal/Low Fat/Low Salt" diet requested by Plaintiff in his complaint, thus rendering Plaintiff's action moot.  Furthermore, Defendants allege that the "3000 Cal/Low Fat/Low Salt" was no longer available after it was replaced

---

[13]   Based on the Court's denial of Plaintiff's Rule 56(f) motion, Plaintiff's motions to compel discovery (docket nos. 24, 36) are DENIED as duplicative.

[14]   Hechanova Decl. ¶ 11, Ex. M.

by the "Heart Healthy" diet.  Defendants allege that the treatment Plaintiff received was reasonable and that they were not "indifferent" to his serious medical needs under any standard.

Deliberate indifference to serious medical needs violates the Eighth Amendment's prohibition against cruel and unusual punishment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  The analysis of a claim of "deliberate indifference" to serious medical needs involves an examination of two elements: (1) the existence of a prisoner's serious medical needs and (2) the establishment of a deliberately indifferent response by Defendants to those needs.  *McGuckin*, 974 F.2d at 1059.

**A.     Existence of a Serious Medical Need**

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  *Estelle*, 429 U.S. at 104.  The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment.  *McGuckin*, 974 F.2d at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

In the instant case, Defendants do not dispute that Plaintiff has a serious medical need. Defendants understand that Plaintiff has a condition that causes him to suffer from chronic stomach pain. In fact, Defendants allege that they have expended a great deal of time and energy administering to Plaintiff's medical needs and attempting to diagnose Plaintiff further.  Plaintiff has undergone a variety of tests -- all ordered and/or approved by Defendants -- including blood tests, x-rays, and CT scans.  In doing so, Defendants have discovered that Plaintiff's condition only involves his intolerance to fatty foods, which is a byproduct of Plaintiff's gall bladder removal.  Consequently, Plaintiff also has a higher than average lipid level in his blood and a mild liver condition.

**B.     Establishment of Deliberate Indifference**

In order for deliberate indifference to be established, there must be a purposeful act or failure to

act on the part of the defendant and a resulting harm. *McGuckin*, 974 F.2d at 1060; *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). Such indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provide medical care. *See McGuckin*, 974, F.2d at 1062. However, mere negligence or harassment related to medical problems is not enough to make out a violation of the Eighth Amendment. *See Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *see also Toguchi v. Chung*, 391 F.3d 1051, 1060-61 (9th Cir. 2004).

Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. *See Franklin*, 662 F.2d at 1344; *see also Toguchi*, 391 F.3d at 1059-60; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to the plaintiff's health. *See Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 551 U.S. at 837), *cert. denied*, 519 U.S. 1029 (1996).

A prison official is deliberately indifferent if he or she knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

In the instant case, Plaintiff has not shown that Defendants' decision not to renew his "3000 Cal/Low Fat/Low Salt" diet amounts to deliberate indifference. Plaintiff has not done so in part because the Court finds that his "3000 Cal/Low Fat/Low Salt" diet was not an actual medical treatment for his gastrointestinal complaints, but rather a 90-day precaution -- taken by PBSP physicians after the

16

**United States District Court**
For the Northern District of California

1   removal of Plaintiff's gall bladder -- that was extended due to his complaints to staff physicians.

2   (Hechanova Decl. ¶ 11.)  Additionally, Plaintiff was examined by a variety of doctors, often multiple

3   times per month.  None of the examining physicians could find anything wrong with Plaintiff other than

4   his being fat-intolerant, and Plaintiff's intolerance to fatty foods was being controlled by medications

5   such as Mylanta, Prilosec, and Zantac.  The Defendants, responding to Plaintiff's continual complaints,

6   ordered multiple tests to be run on Plaintiff, including blood tests, an abdominal and pelvic CT scan, and

7   chest x-rays.  None of these tests revealed anything significant from a disease or illness standpoint.

8   (Thacker Decl. ¶ 6; Hechanova Decl. ¶ 13.)  Even Dr. Soggee, the private gastroenterologist, could not

9   find anything wrong with Plaintiff beyond a "mild liver condition" and the condition of intolerance to fatty

10  foods.  (Hechanova Decl. ¶ 14.)

11          Plaintiff's allegation that Defendants were deliberately indifferent by denying his request for the

12  "3000 Cal/Low Fat/Low Salt" diet fails because Plaintiff was already receiving the dietary needs

13  required for his specific medical condition.  Defendants stress that the "Heart Healthy" diet that PBSP

14  switched to in 2002 is the "nutritional and low fat equivalent of the "3000 Cal/Low Fat/Low Salt" diet,

15  which was no longer available.  (Hechanova Decl. ¶ 16.)  The "Heart Healthy" diet was also proven to

16  meet the dietary needs of Plaintiff.  (Hartman Decl. ¶ 6.)  Further, Plaintiff has been counseled regarding

17  dietary guidelines he should follow in selecting his food items from the "Heart Healthy" diet.  (*Id.*)

18  Before PBSP switched to the "Heart Healthy" diet as the standard for all inmates, Plaintiff's requests for

19  the "3000 Cal/Low Fat/Low Salt" diet were approved on numerous occasions.  (Hechanova Decl. ¶

20  16.)  However, after PBSP switched to the "Heart Healthy" diet, Defendants concluded that because

21  the diet was the nutritional equivalent of Plaintiff's requested diet, there was no reason to grant his

22  request for a low fat/low salt diet.  (*Id.*)  Thus, even if the Court assumes that Plaintiff's requested "3000

23  Cal/Low Fat/Low Salt" diet was the only medical treatment for Plaintiff's serious medical needs and not

24  the equivalent of the standard '"Heart Healthy" diet, the fact remains that the "Heart Healthy" diet is an

25  *alternative medical treatment* for Plaintiff's serious medical needs.  Even when construing the facts in

26  a light most favorable to Plaintiff, the Court still finds that Plaintiff's argument fails because a simple

27  showing of nothing more than a difference of medical opinion as to the need to pursue one course of

28

17

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

treatment over another is insufficient, as a matter of law, to establish deliberate indifference.  *See Franklin*, 662 F.2d at 1344; *see also Toguchi*, 391 F.3d at 1059-60; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970).  In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to the plaintiff's health.  *See Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 551 U.S. at 837), *cert. denied*, 519 U.S. 1029 (1996).  In the instant case, Plaintiff failed to show that the course of treatment chosen by Defendants was medically unacceptable under the circumstances, or that they chose the course in conscious disregard of an excessive risk to Plaintiff's health.  Rather, Plaintiff has repeatedly argued that his requested "3000 Cal/Low Fat/Low Salt" diet merely helps him to "feel better."  (Compl. at 9.)  The physicians and dieticians at PBSP concur that PBSP's "Heart Healthy" diet is the equivalent of the "3000 Cal/Low Fat/Low Salt" diet requested by Plaintiff, and as such, it can be construed to be an acceptable alternative treatment for Plaintiff's medical condition.  Accordingly, the Court finds that Defendants' course of treatment was medically acceptable and was not chosen in conscious disregard of excessive risks to Plaintiff's health.

Based upon the foregoing reasons, Plaintiff has failed to show that Defendants have been deliberately indifferent to his serious medical needs.  Even viewing the evidence and the inferences drawn therefrom in the light most favorable to Plaintiff, no reasonable jury could return a verdict for Plaintiff against Defendants.  Accordingly, Defendants' motion for summary judgment as to Plaintiff's deliberate indifference claim is GRANTED.

**III.    Qualified Immunity**

Defendants claim that summary judgment is proper in this case because they are entitled to qualified immunity from liability from civil damages.[15]

The defense of qualified immunity protects "government officials . . . from liability for civil

---

[15]    Plaintiff did not address qualified immunity in his opposition to Defendants' motion for summary judgment.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The rule of qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Burns v. Reed*, 500 U.S. 478, 495 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a particular sequence of questions to be considered in determining whether qualified immunity exists. A qualified immunity analysis must begin with this threshold question: based upon the facts taken in the light most favorable to the party asserting the injury, did the prison official's conduct violate a constitutional right? *Id.* at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. *See id.* If, however, a constitutional violation occurred, the second inquiry is whether the prison official could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right. *Id.* at 201-02. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [prison official] that his conduct was unlawful in the situation he confronted." *Id.*

The next step under *Saucier* is to consider whether the contours of the right were clearly established, an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. The law has been clearly established that a prison official who knows that a prisoner faces a substantial risk of serious harm from a delay or interference with the treatment of a medical condition may not delay or interfere with that treatment. *See McGuckin*, 974 F.2d at 1062; *Farmer*, 511 U.S. at 837.

Plaintiff alleges that Defendants were responsible for the denial of his request for the "3000 Cal/Low Fat/Low Salt" diet, in violation of his Eighth Amendment rights. Although the law was clearly established that denial of medical care can violate an inmate's Eighth Amendment rights, the Court has already found that Defendants' denial of Plaintiff's request did not rise to the level of denial of care. This is due to the fact that Plaintiff was receiving medical treatment for his serious condition in an alternative a form (the "Heart Healthy" diet, an extra sack lunch, and medication for his indigestion) that Plaintiff

1

believes to be unacceptable.

2

However, even assuming that a constitutional right could have been violated, Plaintiff has not

3

shown nor can he show that Defendants' behavior was unlawful from the perspective of a reasonable

4

prison official in that situation.  It would not have been clear to a reasonable prison official that a

5

nutritionally equivalent diet would expose Plaintiff to a substantial risk of serious harm.  The

6

circumstances in the instant case certainly include a denial of the "3000 Cal/Low Fat/Low Salt" diet that

7

Plaintiff requested; however, reasonable alternatives were chosen for Plaintiff's diet.  Because the law

8

did not put Defendants on notice that their conduct would be clearly unlawful, summary judgment based

9

on qualified immunity is appropriate.  *See Saucier*, 533 U.S. at 202.  Defendants have met their burden

10

of proof in the moving papers.  Meanwhile, Plaintiff did not introduce any evidence to show the

11

existence of a genuine issue of material fact that it would have been clear to a reasonable prison official

12

that denying Plaintiff his "3000 Cal/Low Fat/Low Salt" diet and in the alternative placing him on the

13

"Heart Healthy" diet would expose him to a substantial risk of serious harm.  Therefore, Defendants are

14

entitled to judgment as a matter of law based on their qualified immunity defense.

15

### CONCLUSION

16

For the foregoing reasons,

17

1.      Defendants' Motion for Summary Judgment (docket no. 27) is GRANTED.  The Clerk

18

of the Court shall enter judgment in favor of Defendants.

19

2.      Defendant Linda Rowe is DISMISSED from this action.

20

3.      Plaintiff's motions to compel discovery (docket nos. 24, 36) are DENIED as

21

duplicative.

22

4.      The Clerk of the Court shall terminate any other pending motions and close the file.

23

IT IS SO ORDERED.

24

25

DATED:  September 30, 2005

26

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge

27

28

**United States District Court**
For the Northern District of California

20